
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| JULIE M. ATWOOD, | ) | |
| | ) | No. 35872-1-III |
| Respondent, | ) | (Consolidated w/ No. 35911-5-III) |
| | ) | |
| v. | ) | |
| | ) | |
| MISSION SUPPORT ALLIANCE, LLC | ) | UNPUBLISHED OPINION |
| and STEVE YOUNG, an individual, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DAVID RUSCITO, an individual, | ) | |
| | ) | |
| Defendant. | ) | |

SIDDOWAY, J. — Following a month-long trial, a jury found in favor of Julie

Atwood on her claims of gender discrimination and retaliation against her former

employer, Mission Support Alliance, LLC (MSA), and her former supervisor, Steve

Young. It awarded her $2.1 million in economic damages and $6 million for emotional

harm. The trial court awarded her tax-adjusted attorney fees and costs. MSA appeals the

judgment on the jury's verdict and the trial court's denial of its motions for a new trial or

remittitur.

Whether the verdict should stand turns on aggressive positions taken by Atwood,

sustained by the trial court, on issues affecting both liability and damages. We agree that

the trial court committed reversible error, reverse the judgment on the jury's verdict, and

remand for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL BACKGROUND

While MSA disputed much of Atwood's evidence at trial, it does not contend on

appeal that her evidence, if believed by the jury, was insufficient to support the verdict on

liability. Liability is the controlling basis on which we reverse. Absent a sufficiency

challenge, there is no need to conduct a review of the evidence in the light most favorable

to Atwood.

Since we find error, there *is* a need for us to look at the trial theories of both

parties, and the importance (or not) of the evidence that MSA contends was admitted or

excluded in error. We therefore describe both parties' evidence and theories.

MSA is a federal contractor that provides integration support for work being

performed by the United States Department of Energy (DOE) and other federal

contractors to clean up the 586 square mile Hanford Site in Richland. In 2013, MSA had almost 1,200 employees. One of its divisions, the Portfolio Management Division, assisted DOE in integrating the work being performed by DOE's many contractors. Those familiar with the Portfolio Management Division often refer to it by the acronym "PFM."

Julie Atwood was hired to serve as a project manager in PFM in February 2010. Her offer letter, which she signed to signify her acceptance, stated that her employment was at will, and could be terminated by her or the company "at any time for any reason, with or without cause or advance notice." Ex. 41, at 2.

On September 19, 2013, Atwood was notified that her employment by MSA was being terminated. A letter presented to her at that time attributed her discharge to "disregard to management's verbal and documented instructions" and "a consistent unacceptable pattern and failure to abide by the Company's Standards of Conduct." Ex. 13. Atwood was surprised and upset on learning of the decision. She refused to sign the letter of termination, but did sign a substitute letter of resignation.

Eighteen months later, on March 10, 2015, Atwood filed a charge of discrimination with the EEOC,[1] alleging gender discrimination, retaliation, and disparate unfavorable treatment of female employees. She accused MSA of discrimination and retaliation taking place in September 2013, when it terminated her employment, and in

---

[1] The United States Equal Employment Opportunity Commission.

March 2014, when she alleged it caused her name to be removed from a bid for a federal contract submitted to DOE by Longenecker & Associates.

Atwood's charge of discrimination alleged she had received consistently positive employment reviews and that shortly before she was fired, MSA's investigation of discrepancies in her accounting for work time "cleared [her] of all allegations." Clerk's Papers (CP) at 9513. She charged that she was nonetheless fired and that MSA personnel told DOE senior management "that I was discharged because of time accounting discrepancies," something that "has damaged my reputation and continues to affect my ability to gain employment." *Id.*

MSA's response to the EEOC denied ever stating that its decision to terminate Atwood's employment was the result of time card impropriety. It told the EEOC that the company chose to end the employment relationship with Atwood

> after she exhibited a pattern of failing to abide by requests of her supervisor regarding her whereabouts during work hours, failing to provide advance notice of leave, and having a practice of using her relationship with a DOE client to avoid and/or circumvent her supervisors' plans and/or directives.

Ex. 16, at 1. As for Atwood's claim of bid interference, MSA provided the EEOC with a statement from Longenecker's COO[2] that MSA had nothing to do with her application or failure to be placed in an assignment with DOE.

---

[2] Chief operating officer.

Atwood filed suit against MSA and Young in August 2015. By the time of trial, she claimed constructive discharge in violation of public policy, retaliation for opposing discrimination, and constructive termination substantially motived by her gender. She alleged that Young had aided and abetted the statutory violations. In answering her complaint, MSA and Young denied liability and claimed to have had legitimate, non-discriminatory reasons for terminating her employment.

During discovery, MSA asserted attorney-client privilege and instructed witnesses not to answer questions about a September 19, 2013 meeting at which MSA's then-president and general manager, Frank Armijo, made the decision to discharge Atwood. Its claim of privilege was upheld by the trial court. In ruling on motions in limine, the trial court ruled that having claimed the shield of privilege for the meeting, the MSA lawyers and management employees who were present would not be permitted to testify to discussion at the meeting as support for nondiscriminatory reasons for Atwood's discharge.

TRIAL

The case proceeded to a month-long trial in September 2017. Armijo, who had accepted a position with another company and moved out of state, was not called as a witness. The reasons given by MSA for discharging Atwood were in evidence, however, through Atwood's testimony and MSA's response to Atwood's EEOC complaint, which Atwood offered as exhibit 16. They were also reviewed in Atwood's closing argument.

5

Atwood called 24 witnesses in her case in chief, MSA called 17 witnesses in the defense case, and Atwood called 3 rebuttal witnesses. Well over 100 exhibits were admitted. On the issues that prove dispositive the following evidence was presented, although additional detail is provided in the Analysis section of this opinion.

Before becoming employed by MSA in 2010, Atwood had worked for the Washington State Department of Ecology and for private companies handling solid and hazardous waste management issues. Four of her former supervisors testified at trial to her good work and work ethic.

In March 2012, Armijo hired Young, who was then the mayor of the city of Kennewick, to serve as vice president of PFM. Young had spent his working career in the nuclear industry. In 2008, at a time when he operated a consulting business and was a subcontractor to DOE, he had become a member of the Kennewick City Council. After being elected mayor in 2010, he shut his consulting business. Shortly thereafter, Armijo hired him for a 90-day project that was extended a couple of times. Young accepted the full-time position of PFM vice president in March 2012. He thereafter consistently recorded 56 to 60 hours of work a week: 40 for MSA and 16 to 20 hours for mayoral work for the city of Kennewick.

Once Young was hired, Atwood reported directly to him. Young's first performance review for Atwood, which covered the period from July 2011 through June 2012, was generally positive. Some employees in PFM perceived friction in Atwood and

6

Young's working relationship, however. Several believed that Atwood did not support

Young's role as vice president of the division. Young felt that there were times where it

seemed that he "was not important enough for [Atwood] to communicate with." Report

of Proceedings (RP) at 3782.

*2012 Anonymous Complaint and Investigation*

In September 2012, MSA received an anonymous complaint about Atwood

through its Employee Concern (EC) Program. The EC Program was described at trial as

a whistleblower protection-type program that DOE requires of all of its contractors. DOE

contracts dictate that "employee concerns" reported to a contractor under the program be

investigated within certain time frames and be documented in particular ways.

At MSA, the EC Program was carried out by the office of the president and was

supervised by Chris Jensen, the senior director of independent oversight. Jensen has a

law enforcement background. His function within the president's office was independent

of MSA's other line organizations and included internal audit and risk management

functions in addition to the EC Program.

The employee concern about Atwood, dated September 19, 2012, said that

Atwood

> has created a hostile work environment through intimidation tactics,
> bullying, and her influence with Jon Peschong of DOE/[Richland]. Julie
> has openly bragged about her influence with DOE, and her ability to have
> people removed from their jobs. Julie is often unaccountable at work,
> saying she is in the 200 Area at meetings, when she is actually someplace

7

else. Julie arrives to work at 9 am and leaves around 4 very regularly. In addition, she often calls in "sick" but charges a full day of work as she is working from home. This has been an ongoing issue with other employers at [sic] she has had at Hanford. . . .

Currently, Julie is openly using her influence with Jon Peschong of DOE to retaliate against MSA Senior Management in response poor performance [sic] feedback that she disagrees with.

Ex. 10A at 2. The author did not sign the complaint, expressing "fear that Julie will affect my ability to continue employment with MSA." *Id.*

At the time of the employee concern, Wendy Robbins was MSA's EC Program manager, reporting to Jensen. Robbins interviewed Young, who told her that he heard that Atwood was sometimes not where she was supposed to be during work hours, could be difficult to get a hold of, sometimes called in sick but recorded the day as a workday, and had threatened people in PFM. He told Robbins he nonetheless gave Atwood a "stellar" performance appraisal in June 2012 "based on [her] delivery of quality products on time." RP at 2500.

Young also told Robbins that Atwood had "endeared herself to a couple of DOE representatives which [made] it difficult for him to take action." RP at 2493. Young was particularly concerned about Atwood's friendship with Jon Peschong, the deputy to Jonathan Dowell, one of DOE Richland Operations' assistant managers. Young and Peschong testified at trial to an unpleasant encounter the two had in August 2012, after Young asked Peschong to get additional budget authorization to cover Atwood's salary,

8

failing which Young might terminate her employment. Young claims that at the meeting, Peschong had an internal MSA budget record on which he had highlighted three of Young's staff, telling Young they were the personnel Young should get rid of. Because Young felt sure that Atwood must have retrieved the budget record from a locked shred bin and provided it to Peschong (something she denied), he required her to relinquish her key to the bin.

Peschong's version of the meeting was that Young told him he was going to get rid of Atwood unless Peschong funded her and Peschong cut the discussion off, saying it was "inappropriate to talk about that." RP at 1273. He testified that he did tell Young that he had too much of his budget "sitting in your front office." *Id.* He denied that the document to which he referred in the meeting was an internal MSA record.

Robbins ultimately did not complete an investigation of the 2012 complaint. A November 28, 2012 entry in her "Record of Events," a standard EC Program investigation time line, states that management was aware of issues with Atwood before the employee concern was filed and was working to address them. Atwood was not told about the employee concern or the investigation, and learned of them only after filing suit.

*According to Management, Continuing Issues*

Atwood admitted that Young frequently communicated, orally and in writing, his expectation that his employees keep him posted on their whereabouts on work days. She

9

heard from others that Young occasionally had trouble locating her. She agreed there were times she was late or missed meetings without giving prior notice. But Atwood testified she had committee work that required her to leave the office often, and her practice was to leave a note on her door with her contact information so people knew where she was and could e-mail or phone her if they needed to reach her.

Between 2012 and 2013, Atwood occasionally was late to work without giving advance notice and sometimes gave notice that she was going to be late after the work day had already started.

DOE clients testified that they did not have difficulty contacting Atwood, however. They testified to being very happy with her work.

*A Violation Deemed Insubordinate, and a New Anonymous Complaint*

Early Thursday morning, August 1, 2013, Lynn Tanasse, a PFM employee who reported to Atwood, e-mailed Young, two of his staffers, and other employees who reported to Atwood an "FYI" on "Status on Julie." Ex. 212. The e-mail stated, "Here is a text message I received from her yesterday at 5:30 p.m. This is all I know. . ." *Id.* Atwood's forwarded text message said:

> It will sound like I made this up - After my apt flooded (for the 3rd time) I left a little early to let people in to fix it, I got a call from my sister inviting me last minute to go to Malaysia to be on set while they film a NYC disaster espionage film. It turned into a real offer later in evening so I said yes and sent you all an email from Airport. I will be out today and tomorrow, was already off Friday and mon Tues. I followed up an [sic] all

10

emails and moved only two things that were not time critical. Went over progress and everything is making its way to completion as planned. I'm enroute to Kuala Lumpur rt now. Once in a lifetime op w sister, I'll be doing work while there Steve - re abstract, I'm drafting one for review.

Ex. 213.

According to Young, he had no advance notice from Atwood that she would be away from work. By the time of her text message to Tanasse, that amounted to four days on which, according to him, Atwood failed to appear for work without notice. Young testified that he considered it insubordinate for Atwood to leave without approval and to fail to report to him directly. Within an hour of receiving the forwarded text message, Young sent it along to two employees in MSA's human resources (HR) department, Cynthia Protsman and Susan Hiller, and to Jensen. Protsman was the member of the HR business partner staff assigned to support Young. Young's transmittal of the message stated, "This is for our records. We received no contact from Julie until late yesterday. I still have received nothing from her." Ex. 212.

Later in the day, Young sent Atwood an e-mail stating he had received her message to Tanasse, that policy did not permit her to work remotely, and that he would report her time out as furlough time. He told her in the e-mail to "come see me when you get back" and copied the e-mail to Protsman. Ex. 166B.

11

Atwood returned to work on August 12. Sometime on or after the day of Atwood's return, another anonymous complaint mentioning Atwood was received by MSA. It was typewritten and was dated August 12. It said:

> I want to mention a problem in Portfolio Management that is getting close to Hostile Work Environment or is already there.
>
> Julie Atwood was gone from work for two weeks without staff or the manager knowing where she was or when she would get back to work. (Others in Portfolio Management have to tell the managers even when they will arrive to work late or go to see a Doctor during the day. Vacation time is approved before vacation is taken and work is taken care of.) This is a double standard and everyone can see that.
>
> It is her influence with her DOE leader that probably accounts for the different work treatment she gets. And that is not fair to others who do the work and follow the rules in place.
>
> The other staff is required to work harder to cover her work, because it is at the end of the work year when so many things are due to complete.
>
> She did the same kind of thing last year with an elective "medical" issue. No plans made in advance and she abused that all year long.

Ex. 215.

Following receipt of this complaint and beginning with a meeting that appears to have taken place on August 22, the parties' versions of events leading up to the decision to discharge Atwood diverge. Prescient witnesses included a number of MSA employees working in two chains of command. The following is an partial organization chart that depicts the relationship of the principal MSA employees involved in reviewing Atwood's employment between the time the 2013 anonymous complaint was received and the decision to discharge Atwood was reached:

12



*See, e.g.*, Exs. 1B and 25.

Before we turn to the parties' competing versions of events, we provide a time line

of events between August 22 and September 19 that are largely undisputed. A meeting

was held on August 22 that began with HR business partner Protsman; her client, Young; and the HR Staffing Services lead, Kadi Bence. Christine DeVere, who was MSA's equal employment opportunity officer, joined the meeting in progress. DeVere announced at that meeting or on the following Monday that she would be investigating the anonymous complaint of a hostile work environment.

On August 27, Young met with Atwood to counsel her that she had violated his directives to be onsite and available or apprise him of her whereabouts. He followed up before lunch with an e-mail, saying, "I want to remind you of the policy I had established for PFM:"

> 1.   If you leave the workplace during normal work hours please send me an email or you can text me[. . . ]. Please let me know the time you will be leaving and the approximate time of your return. If you must leave quickly due to an emergency please let me know as soon as possible.
>
> 2.   All PTB[3] must be approved by me in advance. Just a reminder that only I can approve PTB.
>
> As you remember these rules were established early in my tenure as Vice President and it is important that all employees comply.

Ex. 222. Young forwarded a copy of this e-mail to Protsman. He also e-mailed Bence to let her know that he met with Atwood and "reiterated the rules." Ex. 22.

On August 28, DeVere conducted her first interview of a PFM employee in connection with her hostile work environment investigation. A meeting was then scheduled for September 5 for DeVere and Protsman to meet with Young. At the

---

[3] PTB was explained at trial as vacation time.

meeting that took place in Young's office, Young told the women he intended to tender his resignation to Armijo. He proceeded to do so, but Armijo did not accept it.

That afternoon, DeVere received a call from her boss, HR Vice President Todd Beyers, who asked "what the heck was going on" and told her that Young felt she was threatening him. RP at 1870. He told DeVere to cease and desist her interview process.

Also on the afternoon of September 5, Young asked his chief of staff to assemble his lead employees for a meeting. Atwood could not be found. Once the other leads had gathered, he told them he was being investigated and they should cooperate.

Atwood learned she had missed the meeting and sent Young an e-mail the next day to say that she had been in the "PACE" (later described as a high-tech conference room) when he called the leads to his office. She added, "No one let me know, or sent email or text or I would've excused myself and come up." Ex. 9. Young's only reply to Atwood was, "'A complaint has been filed against me, please cooperate with the investigators and answer their questions honestly.'" RP at 2615.

On September 9, Atwood delivered material to Peschong's office and he told her she needed to speak with Dowell. Atwood went to Dowell's nearby office, where he told her he had heard from the deputy manager of DOE Richland Operations, who heard from MSA COO Dave Ruscitto, that she was being investigated for time card fraud. Atwood told Dowell it was not true. She then went looking for Young. When she found Young,

she asked if the investigation being conducted was about her, and he said "No, it's about me." RP at 2858.

Early on the morning of September 12, there was a meeting between Beyers, Young, Jensen, and Ruscitto to review the situation with Atwood. E-mails, documents, and notes provided by Young and his staff were reviewed, and notes were made on a white board that included a history of incidents, beginning with February 2012, when Young contended Atwood failed to comply with his directives. At the conclusion of the meeting, Jensen had his secretary transcribe the notes from the white board. Many of the incidents identified in the September 12 meeting were later cited (along with others) in MSA's response to Atwood's EEOC complaint as examples of her failure to abide by Young's directives. The transcribed record of the white board notes was admitted at trial as exhibit 221.

A "Separate bullet information" section of the white board record contained what Jensen testified was a summary of their review of the documentation:

- Consistent failure to submit accurate and timely timecard
- Numerous absences without supervisor authorization
- Consistent pattern of period of time in work day when nobody knows where she is

Ex. 221. Jensen testified that coming out of the meeting, no decision had been made with respect to Atwood's employment because investigation of the recent anonymous complaint had not been completed.

16

Later that day, Jensen and Beyers met with Robbins and DeVere and directed them to conduct a joint investigation into the anonymous complaint. Jensen told the women that "[Robbins] would look at any special treatment or time-charging anomaly, and . . . DeVere would continue on parallel paths with [Robbins] with her investigation about hostile work environment." RP at 3872. Robbins and DeVere were asked to make the investigation a priority, with a goal of wrapping it up in the following week.

Robbins and DeVere conducted joint interviews of 10 MSA employees from PFM and 2 subcontracted employees on September 16 and 17. Eight of the interviewees said they had not witnessed special treatment, 2 said they believed Atwood received special treatment of time off approval exemptions and used her relationship with DOE managers Peschong and Dowell to avoid being held to the same standards of conduct, and 1 of the subcontractors told them Atwood kept employees notified of her whereabouts and time off.

Atwood was interviewed by DeVere and Robbins on September 16.

On September 17 or 18, Robbins and DeVere provided Jensen and Beyers with a briefing on the investigation results to date.

On September 19, Robbins followed up with some employees on her own because DeVere said she was occupied with an unrelated audit. One follow-up was with Atwood, who had been unable to provide details about her notice and contact during her Malaysian

17

trip.  On September 19, Robbins was directed to pull Atwood out of a meeting and firm up her time line of contact.

Robbins's and DeVere's conclusions reached following the investigation into the anonymous concern were that there was no evidence of time charging violations, special treatment, or hostile work environment.

After Robbins completed the September 19 follow-up meeting with Atwood, Atwood was told she needed to go to Beyers's office.  When she arrived, she was taken to a conference room to meet with Beyers; also present was one of MSA's in-house lawyers.  Beyers provided her with the letter notifying her of the company's decision to terminate her employment, which he asked her to sign to acknowledge receipt.  Rather than sign the termination letter, she signed a letter of resignation.

The parties' disagreement about events occurring on and after August 22 explain their divergent trial theories.

*Atwood's Trial Theory*

We summarize Atwood's evidence in support of her trial theory.

Christine DeVere, whose legal name at the time of trial was Christine Moreland, left MSA's employ in 2014.  (For clarity, we refer to her at the time of trial as DeVere Moreland.)  DeVere Moreland testified that she was invited by Protsman to the meeting that took place on August 22 because Protsman had received an anonymous complaint that Young was creating a hostile work environment.  According to DeVere Moreland, it

18

was not the anonymous concern dated August 12 that is reproduced above. DeVere

Moreland testified that the first time she ever saw that document was after litigation

started.

DeVere Moreland testified that the concern she saw was brought to the August 22

meeting by Protsman, who showed it to her and Young. It was only a couple of lines

long, said "Anonymous" at the top, and accused Young of creating a hostile work

environment by treating some of his employees differently—and it did not mention

Atwood. Atwood did not offer a copy of the complaint described by DeVere Moreland at

trial. DeVere Moreland testified she never obtained a copy from Protsman.

After reviewing the anonymous complaint, DeVere told Young at the August 22

meeting that she would need to interview everyone in his department. She described

Young as cooperative and seeming to understand.

DeVere Moreland testified that when she and Protsman next met with Young on

September 5, he told the two women he had spoken to two of his staff who believed he

was creating a hostile work environment, so he was going to make it easy for them and

resign. He also told them he thought the anonymous complaint was probably from

Atwood. DeVere Moreland described Young as calm and professional during the

meeting.

19

DeVere Moreland conceded that Beyers called her later that afternoon and told her that Young felt threatened by her interview. Beyers was irritated and told her to stop her investigation.

On the afternoon of September 12, DeVere and Robbins were asked to meet with Jensen and Beyers, who directed the women to complete a joint investigation of the anonymous concern with Robbins as lead, and with DeVere's role being to look into the alleged hostile work environment. DeVere Moreland testified that she asked Beyers if the anonymous concern was the one he told her to stop investigating and he said yes, so she had no knowledge of a different, longer complaint that concerned Atwood.

According to DeVere Moreland, Atwood told them when interviewed that Young treated her differently because she was a woman. DeVere Moreland could not recall specifics. She identified exhibit 20 as her handwritten notes taken during the investigation that were produced by MSA. They included a page and a half of notes of the September 16 interview of Atwood.

Her notes of Atwood's interview stated, "Steve does treat her differently, but not as a favorite—can see in his actions." Ex. 20B at 9 (unnumbered). Her notes do not refer to gender discrimination or to any examples of disparate treatment. DeVere Moreland testified that this is because the notes produced by MSA are incomplete.

DeVere Moreland agreed that "the majority" of her and Robbins's interview of Atwood was Robbins asking questions about time cards, absences, and related policies.

20

RP at 2085. She testified that during the timekeeping discussion, Atwood said "something about looking at [Young's] calendar to see if he was doing City of Kennewick work on MSA time." RP at 2085. She testified this is reflected in her notes, which state, "His time accounting and work w/ city." Ex. 20B at 9.

Atwood testified that she gave DeVere and Robbins a number of examples of how Young treated women differently from men. She testified to telling them about two sexist comments Young had made: he asked his female chief of staff, Linda Delannoy, if a prescription bottle was birth control or "[m]ean-a-pause" pills and commented about a male employee having a standing desk as "so gay." RP at 2863-64. She said she felt excluded from activities and meetings, such as charity events. She told them Young had questioned the competence of a female DOE manager.

Atwood testified that when Robbins turned the subject matter of the interview to questions about Atwood's time reporting she was confused, because she was not aware any complaint had been made about her. Atwood testified that she told them that if they were going to look at her time, they better look at Young's, because he was doing city of Kennewick work on MSA time. She defended her action in accepting the invitation to Malaysia, stating that all PFM employees had been notified they needed to schedule furlough time and she had bracketed time in late July and early August when she anticipated possibly taking furlough.

21

DeVere Moreland testified that at the "status update" she and Robbins gave to Beyers and Jensen on September 17 or 18, Robbins told Beyers and Jensen that Atwood suggested that they look at whether Young was doing city work on MSA time. RP at 2088.

Atwood's theory about the real reasons for her discharge was based in particular on (1) DeVere Moreland's testimony that on September 5, Young expressed his belief that the complaint against him was made by Atwood; (2) Atwood's testimony that when interviewed, she accused Young of gender discrimination; and (3) Atwood's and DeVere Moreland's testimony that Atwood told them on September 16 that they should look at whether Young was doing city work on MSA time, and DeVere Moreland's testimony that Robbins passed that information along to Beyers and Jensen on September 17 or 18. It was Atwood's theory that because Young's position as Kennewick mayor was useful to MSA, Armijo and his team became concerned that she would press her charge that Young was committing time card fraud. On the basis of that evidence, Atwood claimed she was discharged in retaliation for MSA's and Young's mistaken belief that she filed the complaint of a hostile work environment, and because, when interviewed, she accused Young of disparate treatment and of violating the False Claims Act[4] by billing the federal government for time spent on city business.

---

[4] 31 U.S.C. §§ 3729-3733.

22

Her discrimination claim was based on her evidence of sexist comments and exclusion from meetings, her evidence of four "comparators" who were treated more favorably than her (discussed below), and the testimony of Sandra Fowler, a former lead counsel for MSA, whose testimony about her own discriminatory treatment by Armijo and other male managers was admitted under ER 404(b).

*MSA's Trial Theory*

We summarize MSA's evidence in support of its trial theory.

MSA's trial theory was that Young had a longstanding and clearly communicated policy that his employees had to be on-site, on time, and locatable. If they could not be, they needed to let him know in advance or as soon as possible. MSA contended that Atwood had frequently been noncompliant, and her two-week unannounced absence before and during the travel to Malaysia was viewed by Young as insubordinate.

It contended that even before learning about the new anonymous complaint, Young sought help from HR staff on counseling Atwood about her failure to comply with his policies. HR Staffing Services lead Kadi Bence testified that Young mentioned his problem with Atwood in a meeting with her and Susan Hiller. The August 22 meeting was arranged to counsel Young on taking disciplinary action against Atwood.

MSA contends there was only one anonymous complaint in 2013—the one reproduced above—and that Protsman gave a copy to DeVere. Copies of the August 12 complaint were admitted at trial as exhibits 215 and 414B and bear a handwritten

23

notation, "Received by EEO on 8/22/13," which MSA claims is DeVere's handwriting. No other trial witness claimed to have seen the several-line complaint against Young that DeVere Moreland described. And e-mails purporting to be written by DeVere and sent from her MSA e-mail account to Robbins or Beyers on August 26, August 28, and September 5, discuss Atwood as a subject matter of the anonymous complaint, characterize the issues with Atwood as a "management problem," and disparage Young's concern about Atwood's influence with DOE. DeVere Moreland claimed at trial that those e-mails, some of which bear puzzling times,[5] must have been created by someone else. She testified they were not written by her.

MSA contends that Protsman invited DeVere to sit in on the August 22 meeting because of the anonymous concern's statement that problems with Atwood were "getting close to Hostile Work Environment or is already there." Ex. 215. It contends that DeVere Moreland was aggressive toward Young during the August 22 meeting, causing him concern about her objectivity. Young testified that at the end of the August 22 meeting, DeVere Moreland told him the Atwood situation revealed "a manager problem." RP at 2564-65. Bence's recollection of the August 22 meeting is that DeVere had more

---

[5] *E.g.*, Exhibits 26B and 227 include e-mails from DeVere that bear transmission dates and times of 3:13:15 a.m. on August 27, and 12:33:53 a.m. on August 29, respectively. The same e-mails are included in other exhibits as having been transmitted at 8:13 p.m. on August 26, and 5:34 p.m. on August 28, however. *See* Exs. 219 and 347.

to say, and was rude and disrespectful of Young, at one point telling him, "There is no need to name drop here." RP at 3692.

Young did not know DeVere well, but he had seen her socializing with Peschong on two occasions, and her apparent friendship with Peschong concerned him. DeVere Moreland acknowledged at trial that she had worked with Peschong years earlier, that as followers of the local hockey team, they "shared hockey in common," and that he had served as a personal reference for her. RP at 2346.

Between August 26 and September 5, DeVere and others communicated with Robbins about the new anonymous complaint because it was similar to the complaint Robbins had investigated in 2012. For a time, Robbins recorded these communications in the record of events for the anonymous 2012 complaint. An entry on August 28, 2013, records Robbins meeting with DeVere "to discuss a new anonymous concern received by HR that alleged a hostile work environment in the Portfolio Management group as a result of Atwood's special treatment and relationship with DOE." Ex. 11.

After DeVere began her and Protsman's September 5 meeting with Young by saying, "I have some questions for you, I'm doing an investigation," Young became upset and told DeVere, "I'll resign before I allow you to investigate me." RP at 2566. He testified that he viewed DeVere's relationship with Peschong as creating a conflict of interest and it bothered him that "nobody's told me what I'm being investigated for." RP at 2568.

25

Protsman testified that during the September 5 meeting with Young, "It appeared [DeVere] was encouraging him to resign." RP at 3599. MSA suggested DeVere *did* want Young to resign, pointing to an e-mail that DeVere sent to Robbins shortly after the September 5 meeting. Asked by Robbins how the meeting with Young had gone, DeVere responded, "Meeting went well. Actually better than I anticipated." Ex. 232.

Meanwhile, Young went see Armijo and angrily told him that if he was going to be investigated, he was entitled to know what he was being investigated for. He discovered that Armijo knew nothing about an investigation and told him to calm down. Armijo told Young he would look into it.

Jensen testified that Beyers told DeVere to stop her investigation after Jensen learned of the anonymous complaint, became aware of problems Young was having managing Atwood, and was told that the complaint was being investigated by DeVere. Jensen felt that Robbins, as the EC Program director, should be investigating the allegations of special treatment and any time-charging issues. Beyers and Jensen spoke with Ruscitto, and the three agreed that responsibility for the investigation should be divided between DeVere and Robbins, who would conduct joint interviews.

Robbins testified that it was at the September 12 meeting with Beyers, Jensen, and DeVere that she first received a copy of the August 12 anonymous complaint. She presumed "with a high level of confidence" that DeVere had the same anonymous

26

complaint that she had. RP at 1749. Robbins opened a new EC Program file, making her first entry on September 12.

Robbins testified that when interviewed on September 16, Atwood told her and DeVere that Young had taken away her role as buyer technical representative and reduced other roles and responsibilities, and she felt retaliated against. According to Robbins, Atwood did not attribute the reduction in her role to the fact that she was a woman, however. Like DeVere's notes of the September 16 interview of Atwood, Robbins's notes of the interview do not refer to any claim of gender discrimination or to any of the examples Atwood claims to have given. Robbins's September 17, 2013 entry in her record of events says of Atwood's interview, "Atwood stated that she does receive 'special treatment' by being excluded from the group and having duties taken away. Atwood believes she is being treated unfairly, but chose not to raise a concern regarding the reduction in duties." Ex. 24. Robbins testified that Atwood did not say anything about Young doing city business during MSA working hours during the September 16 interview.

Robbins testified that what was reported to Jensen and Beyers when she and DeVere briefed them on September 17 or 18 was that they had not found time-charging violations or a hostile work environment but had learned that Atwood and Young clash and Atwood was perceived as having little respect for Young. They reported that DOE influence could not be confirmed or disproved.

27

Robbins testified that it was only when she followed up with Atwood on September 19 to pin down Atwood's time line of alleged communications about the Malaysia trip that Atwood said if they were going to look at Atwood's time, they should look at the time of Delannoy, who Atwood said accompanied Young to city events during MSA time. That statement by Atwood appears in a page of Robbins's notes taken on September 19 and on her September 20, 2013 entry in her record of events.

MSA's trial theory was that the decision to terminate Atwood's employment was based on her continuing disregard of Young's policies. While it treated the 2013 anonymous complaint as an employee concern and needed to complete an investigation, MSA took the position that HR's review of Young's problems with Atwood was preexisting, intensified with the Malaysia trip, and was proceeding on a separate path before the anonymous complaint came to light. Its position was that while the EC investigation found no evidence to sustain the charges in the August 12 anonymous complaint, the history of Atwood's disregard of Young's directives was a separate issue and a sufficient basis for discharging an at-will employee.

MSA contended that Young did not treat women differently, that he did not believe Atwood filed a complaint against him, and that MSA management was unaware in deciding to terminate Atwood's employment that Atwood had accused Delannoy or Young of doing city work on MSA time. MSA also contended it would not have been worried about Young's city work, pointing out that when a formal concern about

28

Young's timekeeping was later made in 2015, it triggered a cybersecurity investigation that found no time-charging violations or e-mail misuse. It did result in a requirement that Young keep more detailed time records.

At the conclusion of trial, the jurors returned unanimous verdicts finding the discrimination and retaliation alleged by Atwood. One juror believed that MSA proved that Atwood failed to mitigate her damages, and two jurors disagreed with the damages awarded. The jury awarded Atwood $2.1 million in economic damages and $6 million in emotional distress damages.

MSA filed posttrial motions, including a motion for a new trial or for remittitur. It argued in part that Atwood's counsel committed misconduct during closing argument by improperly encouraging the jury to punish MSA and that the damage award could be explained only as the product of passion and prejudice.[6] The trial court denied the motions. MSA appeals.

---

[6] It pointed to counsel's argument, speaking of Atwood's discrimination claim, that:

> We have to call them out or it won't stop. . . . It doesn't make a difference to us in terms of damages, but it does make a difference in terms of their conduct today and their conduct tomorrow. Our goal is to eradicate discrimination. So that's why this claim is still here.
> . . . We need to change their way of thinking.

RP at 4900-01.

29

ANALYSIS

I.  THE TRIAL COURT COMMITTED ERROR IN ADMITTING EVIDENCE INVOLVING
    DISCIPLINE OF AND COMPLAINTS BY OTHER EMPLOYEES, AND THE ERROR IS
    REVERSIBLE

MSA contends that the trial court committed reversible error by admitting

evidence of its treatment of five other employees: Lowell M., Scott B., Michael T., Mary

R., and Sandra Fowler.[7]  Before trial, MSA moved in limine to exclude evidence of its

treatment of other employees, relying on ER 404(b).  Atwood did not file a written

response, but agreed in oral argument that ER 404(b) analysis applied.  While we would

analyze "other employee" evidence differently depending on whether the other employee

was being discriminated against or treated favorably,[8] it does not matter here.  Both

---

[7] The first four employees' identity is irrelevant and their discipline was presented without notice to them or any opportunity to respond.  For that reason, we identify them in a limited way.

[8] In a lawsuit alleging discrimination or retaliation, two types of evidence of an employer's treatment of other employees can be relevant.  One is evidence of the employer's acts of discrimination or retaliation against other employees.  ER 404(b) does not permit evidence of wrongs or acts to be used to prove bad character or action in conformity with that bad character, however.  Evidence of the employer's acts of discrimination or retaliation against other employees must be reviewed for its admissibility under ER 404(b).

The other type of relevant evidence is evidence that an employee outside of the plaintiff's protected class faced a similar accusation of wrongdoing or problematic behavior by the employer that was addressed by the same decision maker or decision makers but was more favorably treated.  The existence of such a "comparator" is circumstantial evidence from which an inference can be drawn that discrimination explains the different treatment.

Both types of evidence require similarities between the circumstances of the other employee and the plaintiff.  In the case of 404(b) evidence, similarity is required because

parties and the court believed that before "other employee" evidence was admissible, ER 403 balancing of undue prejudice against ER 401 relevance applied.

### A. Disparate Treatment of Other Employees

Disparate treatment of similarly situated employees constitutes circumstantial evidence supporting a finding of discrimination or retaliation. *Johnson v. Dep't of Soc. & Health Servs.*, 80 Wn. App. 212, 227, 907 P.2d 1223 (1996). Individuals are similarly situated when they have similar jobs and are involved in the same type of workplace violation. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640-41 (9th Cir. 2003). A proper comparator in this case would be a male at-will employee in a position similar to that of a PFM project manager, against whom action was taken for failing to be on site, available and locatable during working hours.

*Lowell M.* Atwood was permitted to present evidence that in November 2015, more than two years after her resignation in lieu of termination, a "last chance letter" was issued to Lowell M. Ex. 87 (capitalization omitted). Lowell was a union member. According to the letter, he was a metal trades worker supervised by the manager of

---

"[f]or such testimony to be relevant . . . the plaintiff must show the circumstances involving the other employees are such that their statements can logically or reasonably be tied to the decision to terminate the plaintiff." *Curtis v. Oklahoma City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1217 (10th Cir. 1998) (alterations and internal quotation marks omitted). In the case of a comparator, it is the similarities between the plaintiff's and the comparator's employment position, workplace violation, and common decision maker that allows a trier or fact to rationally infer that harsher treatment of the employee in the protected class was the result of discrimination or retaliation.

Electrical Utilities. The letter pointed out that in prior months, Lowell failed to report to an overtime assignment, failed to report that he would be late, or called in late, claiming to be sick. The letter stated that "further violations of any kind will result in termination of your employment." Ex. 87 (boldface omitted).

The letter was displayed to jurors and Beyers was questioned about it.[9] Although Beyers pointed out that Lowell was a union employee, Atwood's counsel used the exhibit to make the point that "a last chance letter is something the company can do for any employee if it wants to." RP at 3337.

While failing to call in or show up for work on time was similar to the charge that Atwood violated directives to be on-site, on time, and locatable, there was no evidence that Lowell's position was similar to Atwood's. There was no evidence that his last chance letter, remote in time from Atwood's termination, was issued by the same decision makers. The fact that Lowell was a union member entitled to progressive discipline was reason enough to exclude him as a proper comparator.

*Michael T.* Atwood was allowed to offer a memorandum from Beyers to Michael T. from June 2010, over three years before Atwood resigned in lieu of termination. No evidence was presented as to what Michael did for MSA or even the division for which

---

[9] The trial court stated it was admitting the letter for illustrative purposes, evidently because it did not intend to make it available to jurors during deliberations. We agree with MSA that whatever the court intended, describing the exhibit as admitted for "illustrative purposes," RP at 3336, would be lost on the jury without further explanation.

Michael worked. While Beyers signed the memorandum, he testified he would not have written it; it would have been written by his staff, and he did not recall the details. Asked, "But it was a guy, right? This is a man?" Beyers answered, "Only by name would I make that connection." RP at 3345.

Beyers's memo reminded Michael that he or she had agreed not to disclose confidential information, and stated, "Your participation of ongoing negative and demeaning comments that directly affected the relationships with the DOE client and MSA employees is unacceptable and will not be tolerated." RP at 3344-45. The memo revealed that Michael was given a two-week suspension.

The only similarity between Michael's workplace violation and Atwood's employment history was that Young believed Atwood shared a confidential budget record with Peschong in August 2012—but that was not a basis for her termination. There is no evidence that Michael held a similar position with MSA.

*Scott B.* Most problematic was an investigation report Atwood was allowed to offer involving an employee concern filed by an MSA truck driver, Gerry I., who complained that Scott B., a vice president, retaliated against him after Gerry told Scott to stop flirting with and attempting to contact Gerry's wife. Gerry had addressed the flirtation/contact issue with Scott himself, without requesting that the HR department become involved.

33

When driver layoffs taking place at MSA later increased to a point that affected Gerry, he feared Scott had manipulated the layoffs so that it would affect him. Gerry's employee concern about a retaliatory layoff was investigated by DeVere, who found "[t]here was not any evidence to conclude that [Scott] had deliberately looked at a seniority list . . . or changed any of his affected position numbers." Ex. 400, at 5.

In questioning Beyers, Atwood's lawyer had no questions about Gerry's retaliatory layoff charge. He wanted to ask about the off-site sexual advance that Scott, a management employee, made to Gerry's wife. He read from an HR memo about how, when Gerry and his wife visited with Scott at a bar one night, "[Gerry] noticed that [Scott] had placed his hand on his wife's inner thigh, near her crotch." RP at 3324.

DeVere Moreland testified it was her recommendation that for the off-site "sexual harassment piece" Scott be "reprimanded" rather than subjected to any more serious discipline. RP at 2350. Beyers testified that notwithstanding DeVere's recommendation, his recollection was that Scott was removed from his position and reclassified. He testified that he did not provide the approval for whatever action was taken against Scott, and he did not know who did.

Atwood's workplace violation was not off-site behavior and no third party objection resolved it. No one involved in the decision to terminate Atwood's employment was shown to have blessed DeVere's recommendation of a reprimand or imposed whatever other discipline was imposed on Scott. Scott came nowhere near

34

being a proper comparator. The transparent reason Atwood offered the evidence was to present offensive sexual conduct committed by a management employee of a different MSA division.

*Mary R.* Finally, Atwood was allowed to offer evidence of a December 2010 memorandum to Mary R., giving her a written warning about having "malicious and inappropriate conversations . . . regarding co-workers." Ex. 163. Since the evidence did not relate to another employee's claim of discrimination or retaliation, Mary appears to have been offered as a comparator. Inasmuch as Mary is a woman, however, she cannot be a comparator in a gender discrimination case. Nor was any evidence presented of her position when she committed this dissimilar workplace violation or whether someone involved in disciplining Mary was a party to the decision to terminate Atwood's employment. As we conclude was the case with the other so-called comparators, the evidence appears to have been offered to demonstrate that MSA had disciplinary options—it was not required by policy or practice to discharge an errant employee.

None of the four employees was a proper comparator. Admission of evidence of their treatment was error. We do not reverse a verdict based on an evidentiary error unless the error was prejudicial, however. *Diaz v. State*, 175 Wn.2d 457, 472, 285 P.3d 873 (2012). An error is prejudicial if it affects, or presumptively affects, the outcome of the trial. *Id.* Conversely, an error is harmless if the improper evidence is "of minor significance" in comparison to the evidence as a whole. *State v. Bourgeois*, 133 Wn.2d

389, 403, 945 P.2d 1120 (1997). In deciding harmless error, we may consider how the case was argued to the jury. *State v. Brown*, 147 Wn.2d 330, 332, 58 P.3d 889 (2002).

As a general principle, absent a definite contract, employees are terminable at will. *Rose v. Anderson Hay & Grain Co.*, 184 Wn.2d 268, 275, 358 P.3d 1139 (2015). Atwood's signed acceptance of MSA's offer letter made this explicit as to her employment. The jury was properly instructed that Atwood was an "at-will" employee

> who could be lawfully discharged at any time without good cause, or for bad cause, or for no cause at all unless otherwise prohibited by law.

CP at 11051 (Instruction 6). It was instructed that her three claims required her to prove that "Ms. Atwood's gender was a substantial factor in MSA's decision to terminate her," CP at 11052 (Instruction 7), that "a substantial factor in the decision to terminate Ms. Atwood was her opposition to what she reasonably believed to be discrimination or retaliation on the basis of gender," RP at 4656 (Instruction 9), and "that [Atwood's] public policy linked conduct was a substantial factor in the employer's decision to terminate her." RP at 4659 (Instruction 12).

The jury could not infer discrimination or retaliation from the fact that over a five year period, four of MSA's almost 1,200 to over 1,350 employees[10] received discipline for unrelated workplace violations that was less harsh than termination of employment.

---

[10] The EEOC requested information from MSA about the number of persons it employed and it responded that it had 1,193 employees in 2013, 1,175 in 2014, and as of the time it responded in 2015, it had 1,360. Ex. 16, at 12.

Evidence of the unrelated discipline of these other employees was not relevant. To quote ER 401, the manner in which Lowell, Scott, Michael, and Mary were disciplined had no "tendency to make the existence of any fact that [was] of consequence to the determination of [Atwood's claims] more probable or less probable than it would be without the evidence."

Atwood misused this irrelevant evidence. In theory, the comparator evidence should have been relevant only to the discrimination claim: if two significantly similar discipline situations are reviewed, the only difference is the employees' gender, and the male is treated more favorably, an inference of discrimination can be drawn.

Atwood, however, relied on the comparators for *all* her claims, and to suggest to jurors that they could infer an unlawful motive from the fact that unlike Lowell, Scott, Michael, and Mary—none shown to be a similar situation—she did not receive discipline short of termination. Atwood's lawyer suggested in questioning witnesses that the comparator evidence was relevant to show that MSA had the option to be "more compassion[ate]" and impose progressive discipline. RP at 3341. In closing argument, Atwood argued that if an employer terminates an employee precipitously rather than impose progressive discipline, "that's a good indicat[ion] . . . they're concerned about some behavior that most recently happened"—in other words, the termination is retaliatory. RP at 4715. Atwood's lawyer asked jurors at one point to "take out" the discrimination claim, consider only her whistleblower theories, and consider the

37

relevance of denying her progressive discipline. *See* RP at 4892-97. Atwood argued that the whistleblower claims were proved, among other ways, by "show[ing] that there is no paper trail" leading to termination, and "[t]here's no record of counseling or progressive discipline"—by showing that MSA "fired [an employee] even though [the employee] was doing a great job and without documented progressive discipline." RP at 4895, 4897.

Atwood used the comparators to imply that MSA had a duty to consider lesser discipline, which is to contend that she was not terminable at will—and she explicitly agreed to be terminable at will.

Not only was the evidence not relevant, but it had a clear capacity to confuse the issues and mislead the jury. All of it implied to jurors that the fact that MSA meted out milder discipline to four differently-situated employees over a period of five years was relevant to their deliberations, when it was not. And the evidence about Scott was "bad acts" evidence, mischaracterized as a comparator, which Atwood used to argue that MSA's retaliation was unsurprising, given its misogynistic culture. *See* RP 4727-32. In closing argument that was not limited to the discrimination claim, Atwood argued (contrary to the evidence in an important respect):[11]

> [L]ook what's also happening under Armijo. Exhibit 400. This guy, vice president . . . a male, reporting to Armijo. He basically puts his hand on the leg near the crotch of this spouse of an MSA truck driver at a party. What a

---

[11] As earlier explained, Gerry, the truck driver, never sought assistance from the HR Department in dealing with Scott's inappropriate conduct toward his wife.

pig. Oh, my goodness. What do you do with somebody like that? You fire them like that. Well, he doesn't get fired. He gets—basically the husband has to stand up and tell—picture this: You're a truck driver and you're telling a vice president, you leave my wife alone. You don't put people in that position, but they did here. And he is not fired. Unbelievable that he is not fired and Ms. Atwood is and not even told what she did wrong. This, this shows you a culture in crisis. This is a world where Armijo, for whatever reason, if you're in the boys club, you're safe; if you're a woman, we don't need you.

RP at 4730-31.

Later on in closing, Atwood argued:

Comparators. This is how we prove this case. We have proved it with comparators. . . .
But here's the thing. These comparators are fairly dramatic. You don't usually see this kind of thing, right? In a corporate culture that is healthy men who engage in improper behavior are treated the same as women; right? . . . [I]t appears like women fled the scene, but we have men. And even if you believe that Ms. Atwood did the deeds claimed of, so we're sort of saying, let's analyze this as a discipline case. Let's compare her to other people who got disciplined. Of course our position is she should not have been disciplined because she didn't do anything wrong, and I think we've proven that. But for comparator sake, let's look at men that we know did something wrong and see how they were treated.
. . . None of these men are terminated. That's our case. That's our discrimination case. That's all it is. It has nothing to do with conspiracies, it has nothing to do with fake documents or what they did. That's our case. And we think it's enough for you to find discrimination.

RP at 4906-08.

Atwood's evidence was sufficient but her case was not strong. On events critical to her claims (the September 5 meeting with Young, Atwood's September 16 interview, and DeVere and Robbins's September 17 or 18 briefing of management), only DeVere

and Atwood, if present, supported Atwood's version of events; no one else did. Most of MSA's employees and former employees and key pieces of documentary evidence supported its defense. Atwood countered MSA's witnesses and exhibits by pointing out inconsistencies and with a theory that real records had been destroyed, false records had been created, and—given corrupt MSA management—its employees testified falsely, in fear for their jobs. She also countered MSA's evidence by arguing that given the comparators, Atwood's treatment was unfair. We do not lightly reverse a jury verdict, but we are satisfied that the improper comparator evidence alone had a clear potential to affect the outcome of the trial. Reversal is required.

Because we reverse the jury's verdict on liability, we need not address all of MSA's assignments of error. We address three additional issues because they present additional error or because the same issues will be presented in a retrial.

### B. Bad Acts Evidence

Before trial, MSA moved to exclude evidence from Sandra Fowler, a former in-house lawyer for MSA, who claimed that Armijo subjected her to disparate treatment and Beyers subjected her to retaliation. The evidence was admissible under ER 404(b) only if the trial court identified a proper purpose for which the evidence would be admitted and then, on the record, balanced the probative value of the evidence against its potential for prejudice. *Brundridge v. Fluor Fed. Servs., Inc.*, 164 Wn.2d 432, 444-45, 191 P.3d 879 (2008). In addition, for the evidence to be admissible, the court was required to find at

least substantial evidence, and arguably by a preponderance of the evidence, that the prior

discrimination occurred. *Id.* at 448-49.[12]

Before ruling on MSA's motion, the trial court required Atwood to present an

offer of proof that included an opportunity for cross-examination by MSA. The offer of

proof established that Fowler was employed for a time as MSA's lead counsel and

voluntarily resigned in August 2015. She later filed a complaint with the EEOC. In

Atwood's offer of proof, Fowler testified to the following:

- When Armijo became president and general manager in 2010, he treated her with disrespect. This included telling her to "shut up" in a meeting with MSA's vice presidents;

- When Armijo made changes in his direct reports, it was often to replace women with men, and once Armijo was hired, it was male members of management who were given offices on his floor;

- During her tenure she hired two lawyers who reported to her. Both were paid more than her. Believing she was underpaid, she made several requests for a review of her salary;

- At a meeting with Armijo, Beyers, and Ruscitto in October 2012, Beyers— referring to her request for a salary review—accused her of filing a gender discrimination complaint;

- In the summer of 2014, Armijo promoted Fowler's second staff attorney hire—Stan Bensussen—to the position of chief counsel, relegating Fowler to what amounted to an associate counsel position;

- Following his promotion, Bensussen treated her dismissively and told her that she should kiss the ground that Armijo and Ruscitto walk on;

---

[12] In *Brundridge*, the Supreme Court reserved the issue of whether, when the evidence is of a noncriminal act or is offered in a civil case, the proponent must prove by a preponderance of the evidence that the act occurred. 164 Wn.2d at 448-49.

- After she made an ethics complaint against Armijo in late December 2014 that was resolved in his favor in February or March 2015, he refused to speak to or acknowledge her.

*See* RP at 3356, 678-750.

When cross-examined during the offer of proof, Fowler testified that she was 7 or 8 years out of law school and had no general counsel experience when MSA hired her as in-house lead counsel. Her performance evaluation for calendar year 2012 was presented, which spoke about a need for her to work on her presentations to senior management, which were sometimes incomplete and confusing. It stated that her interaction with DOE's chief counsel's office "remains a challenge" and she should "work hard in the next year to gain the respect and establish a partnering relationship." RP at 698. The evaluation observed that during 2012 "she brought on an experienced attorney to supplement her staff." RP at 697. Fowler acknowledged that the lawyer hire—her first—had over 30 years legal experience.

It was established that Bensussen, the second of the two lawyers she hired, and the one who was promoted to chief counsel, also had over 30 years' experience. It was established that Atwood had already resigned in lieu of termination before Fowler hired Bensussen. Fowler was lead counsel when the decision was made to discharge Atwood.

It was established that Fowler's ethics complaint about Armijo was made shortly before he left the position of president, that her charge was investigated by the internal audit department of Lockheed Martin, which was Armijo's employer (Armijo had been a

42

borrowed employee) and that Armijo was cleared. His refusal to speak with her that followed was at a time when he no longer worked for MSA.

It was established that her 2015 employee concern alleging she was disparaged by Bensussen did not complain of any other member of management, was investigated by Robbins and another MSA employee, and was resolved as unsubstantiated.

Fowler had testified that at the time she left MSA, she made a formal complaint about being underpaid. In cross-examination, she was shown a report, marked for identification as exhibit 30, which MSA's counsel identified as a third party review triggered by her complaint that concluded she was paid more than a market rate for a lawyer with her experience. Fowler had not seen and did not agree with the report, although she agreed that it accurately reflected her salary history at MSA.

The trial court conducted an ER 404(b) analysis on the record. It did not find by a preponderance of the evidence or find even substantial evidence that Fowler was paid less based on her gender. It did find she had complained about being disparately underpaid, however. It ruled that most of Atwood's proposed evidence from Fowler was admissible for the purpose of proving "motive, plan, intent and/or pretext for discrimination." RP at 743. While noting that Fowler's experience did not always involve the same chain of command as Atwood's, the court cited as the "foundation for [its] ruling" that "[a] corporate culture comes through its key players, those at the top." RP at 742. The only testimony from Fowler that it disallowed was testimony about

43

claims by other employees that might have come to Fowler's attention as MSA's counsel.[13]

In the employment context, evidence of how an employer treats other employees may be admissible to show motive or intent to retaliate. *Brundridge*, 164 Wn.2d at 445-46. *Brundridge* involved the claim of 11 plaintiffs that they were retaliated against by Fluor for reporting safety concerns. As issue on appeal was whether the trial court's decision to admit three matters was erroneous under ER 404(b).

The first was evidence of a nonparty employee who voiced a safety concern and experienced retaliation. Noting that the employee made the same type of complaint, to the same chain of command, at the same time as the plaintiffs' complaint, the court found the evidence "highly probative" that Fluor's retaliatory conduct was intentional. *Brundridge*, 164 Wn.2d at 446.

The second, also found to be relevant, was evidence of a nonparty employee who spoke to a member of the chain of command about the lack of resolution of her concern and was told "'not to sacrifice [her] career for [her] ethics.'" *Id.* at 446 (alterations in original).

---

[13] The court also discouraged MSA from presenting a trial within a trial about whether Fowler was in fact paid unfairly, as she claimed. But it recognized that MSA might want to prove that she was fairly paid rather than accept the limiting instruction that the court offered as an alternative.

The third was evidence of two other potentially dangerous gas releases that had occurred at Fluor, one of which, through omissions of information, was arguably downplayed in company reports. While the Supreme Court found the report omissions to have some probative value, it concluded that taken together, the incidents had "minimal probative value" to the elements of the plaintiffs' claims and "had the potential to prejudice the jury by leading them to believe that Fluor was a 'bad company' in general." *Id.* at 447.

*Brundridge* cited to federal cases holding that only similar situations should be admitted as evidence of an employer's other bad employment acts. Federal courts disagree on the required extent of similarity. *See* Emma Pelkey, Comment, *The "Not Me Too" Evidence Doctrine in Employment Law: Courts' Disparate Treatment of "Me Too" Verus "Not Me Too" Evidence in Employment Discrimination Cases."* 92 OR. L. REV. 545, 549-52 (2013). In *Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379, 388, 128 S. Ct. 1140, 170 L. Ed. 2d 1 (2008), the United States Supreme Court held that in a case alleging age discrimination by a plaintiff's supervisor, the federal rules of evidence do not make evidence of the discriminatory acts of a different supervisor per se admissible or per se inadmissible. Rather, whether such evidence is relevant is "fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Id.* Following *Sprint*, it has been suggested that federal courts' analyses "include the following factors: (1) temporal and

geographic proximity between the other employee and the plaintiff, (2) whether the other

employee and the plaintiff were treated in the same manner, (3) whether the same

decisionmakers were involved, and (4) whether the other employee and the plaintiff were

similarly situated." Pelkey, *supra*, at 554.

We find no abuse of discretion by the trial court in allowing Atwood to present

Fowler's testimony about actions of Beyers and Armijo (while he served as MSA's

president and general manager) that she viewed as disparate treatment or retaliatory.

We do find an abuse of discretion in allowing Fowler to testify to her complaints

about Bensussen and her claim that she suffered retaliation by Armijo after he no longer

worked for MSA.

Her employee concern about Bensussen (and only Bensussen) was determined to

be unsubstantiated. More importantly, Bensussen was not even employed by MSA when

the decision was made to discharge Atwood. Bensussen was hired <u>by Fowler</u> after

Atwood's resignation, and his complained-of lack of respect for Fowler took place in a

different corporate department, well after Atwood was gone. In closing argument,

Atwood conceded it was offering Bensussen's actions as "only important to help you

understand that there is a cultural problem under Armijo." RP at 4727-28.

As for Armijo's alleged retaliation for Fowler's ethics complaint, his refusal to

speak to or acknowledge her occurred when she encountered him after he no longer

worked for MSA. And it was after she accused him of what was determined to be an

46

unfounded ethical violation.  It can be actionable retaliation for a supervisor to exclude an employee from, e.g., regular weekly lunches with all other employees in a unit since it could reasonably deter the employee or others from protected activity.  *See* EEOC, NOTICE 915.004:  ENFORCEMENT GUIDANCE ON RETALIATION RELATED ISSUES § II(B)(2) ex. 13 (Aug. 25, 2016) (applying federal law; also concluding it would *not* be unlawful retaliation if a supervisor excluded an employee from a single lunch with several other employees, even if done for a retaliatory reason).[14]  Atwood offers no authority that it was actionable retaliation for Armijo to choose not to greet or engage Fowler in conversation when he encountered her after leaving MSA's employment.

No proper evidentiary purpose was served by allowing Fowler to testify to her complaints about Bensussen or the ethics complaint about Armijo (which was not a complaint about gender discrimination) that she believes explains his cold shoulder after he left MSA.  Like the Scott B. comparator evidence, they were offered for the purpose— and presented the danger, recognized in *Brundridge*—of prejudicing the jury by leading it to believe that MSA "was a 'bad company' in general."  164 Wn.2d at 447.

II.    ERROR IN THE HEARSAY RULINGS CHALLENGED ON APPEAL IS EITHER UNPRESERVED OR WAS INVITED

MSA contends that the trial court erroneously sustained hearsay objections that frustrated its ability to present a defense.  It also assigns error to a limiting instruction

---

[14] Https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues#2._Types [https://perma.cc/E9DC-NUW4].

given by the court when an MSA employee testified to information collected that provided lawful reasons for terminating Atwood's employment. All told, it assigns error to 11 rulings or instructions. Five of the challenged rulings do not warrant discussion other than to point out that they were not erroneous, that error was not preserved, or that they were harmless.[15] We turn to the remaining 8.

Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. ER 801(c). "A statement is not hearsay if it is used only to show the effect on the listener, without regard to the truth of the statement." *State v. Edwards*, 131 Wn. App. 611, 614, 128 P.3d 631 (2006). This principle has special application in the context of employment cases where the central issue is whether the employer acted for an improper purpose. Where a statement is offered not to prove the truth of the matter asserted but instead to show an employer's motivation for terminating an employee, the testimony is not hearsay. *See, e.g.*, *Domingo v. Boeing Emps. Credit Union*, 124 Wn. App. 71, 79-80, 98 P.3d 1222 (2004), *abrogated on other grounds by Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County*, 189 Wn.2d 516, 404 P.3d 464 (2017); *Rice v. Offshore Sys., Inc.*, 167 Wn. App. 77, 86-87, 272 P.3d 865 (2012).

---

[15] The ruling at RP 4198-99 was correct. At RP 3998 and RP 4127-30, the rulings were in error but error was not preserved; defense counsel never stated it was offering the evidence for something other than its truth.

The record admitted at RP 3324-25 was likely a business record, although the required foundation was not laid. At RP 3348-49, an order to cease and desist is an imperative statement, not an assertive one, and identifying who gave the order is not hearsay. These errors were harmless.

The relevance of such a statement in the context of an employment case is not limited to its effect on the immediate hearer. It can be circumstantial evidence probative of intent. Remarks not made directly in the context of an employment decision may be relevant circumstantial evidence in a discrimination case. *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 450 n.3, 334 P.3d 541 (2014) (citing *Reid v. Google, Inc.*, 50 Cal. 4th 512, 538-46, 235 P.3d 988, 113 Cal. Rptr. 3d 327 (2010)). They are not hearsay if offered to demonstrate the effect the investigations had on the employer and as evidence of the employer's motive. *Montoya v. Orange County Sheriff's Dep't*, 987 F. Supp. 2d 981, 993 (C.D. Cal. 2013); *accord Hernandez v. City of Vancouver*, 277 F. App'x 666, 672 n.2 (9th Cir. 2008) (citing *Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001)); *Means v. City of San Francisco*, 749 F. Supp. 2d 998, 1006 (N.D. Cal. 2010) (allowing evidence of statements made in an employer's investigation into employee's inappropriate conduct to show that the employer had a nondiscriminatory motive for taking disciplinary action); *Turner v. Univ. of Wash.*, C05-1575RSL, 2007 WL 2984685, at *2 (W.D. Wash. Oct. 10, 2007) (court order) (denying plaintiff's motion to exclude employment investigation files and witness statements to the extent they were being offered to demonstrate that defendants had a nondiscriminatory basis for their actions).

Critical to Atwood's case against MSA, for example, were two statements that could be challenged as hearsay: testimony that Young said he suspected Atwood of filing

the anonymous complaint, and evidence that Atwood told investigators Young was doing city work on MSA time. That testimony would be hearsay if offered for the statements' truth. But it could be offered for its effect on the state of mind of those hearing the statements, or hearing *of* the statements—not only those in the room, but those up the chain of command. Atwood wanted the jury to infer (and evidently it did) that when the decision was made to terminate her employment, it was because Armijo learned that Young suspected Atwood of making the anonymous complaint and that Atwood was charging Young with doing city work on MSA time.

Washington courts have frequently observed that an employee ordinarily must rely on circumstantial evidence "since the employer is not apt to announce retaliation as his motive." *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn.2d 46, 69, 821 P.2d 18 (1991). In this case, given MSA's assertion of attorney-client privilege and the trial court's in limine ruling, MSA was also unable to offer direct evidence of the information significant to Armijo in making the termination decision. It, too, had to rely on circumstantial evidence. Just as Atwood hoped jurors would infer that Armijo learned things that (true or not) caused him to act discriminatorily and to retaliate, MSA hoped jurors would infer, instead, that Armijo learned things that (true or not) caused him to conclude that Atwood's talent was outweighed by problems she was creating in PFM.

The hearsay rulings to which MSA made a timely and proper objection came during the testimony of Jensen. The trial court first sustained objections to what Jensen

50

learned about Atwood from Young, despite counsel's explanation that it was not being

offered for truth. After Atwood interposed a hearsay objection to Jensen's testimony

about what he learned from Robbins, MSA's counsel argued the nonhearsay character of

Jensen's testimony during the next recess. After hearing MSA's argument that it was not

offering evidence about what Jensen was hearing for its truth, the trial court relented,

saying it would allow the testimony with a limiting instruction that the jury could

consider it "as the basis of Mr. Jensen's knowledge and not [as] substantive evidence."

RP at 3854. MSA's counsel responded, "Correct." *Id.*

When Jensen's examination resumed, he was asked again about his discussion

with Young about Young's concerns, and the trial court interjected a limiting instruction:

> [L]adies and gentlemen of the jury, when Mr. Jensen is going to be
> testifying about what Mr. Young had told him, this is information for you
> to use as to explaining Mr. Jensen's state of mind and why he may have
> acted in one way or another. It's not substantive evidence. In other words,
> what Mr. Young told him isn't substantive evidence, it is to be used by you
> only for you to take into consideration Mr. Jensen's state of mind of how he
> acted after that.

RP at 3868-69. The court interjected a similar limiting instruction several more times

during Jensen's testimony.

The trial court also gave a limiting instruction when MSA relied on Jensen to

establish a foundation for admitting exhibit 221, the white board record of Atwood's

alleged violations of Young's directives during 2012 and 2013. In admitting the

evidence, the trial court told the jury it was being admitted

51

only for the purpose of providing notice of information to this witness, Mr. Jensen. It's not independent substantive evidence.

So you are to consider Exhibit 221 only for the purpose of what Mr. Jensen knew and explaining why he may have taken one or more actions from this.

RP at 3882. MSA did not object.

For the first time on appeal, MSA argues that the limiting instruction was erroneous and a comment on the evidence. It argues that Jensen's testimony *was* substantive evidence of MSA's motivation for terminating Atwood.

Evidence of an out-of-court statement that is not offered for its truth is not hearsay. If it is relevant and not inadmissible for some other reason, it *is* substantive evidence. It was error to tell the jury that it was not.

And just as it would have been error to tell jurors that the statements by Atwood and Young that were important to Atwood's case could be considered only for their effect on the people in the room, the court's limiting instruction was too narrow in suggesting that information provided to Jensen could be considered solely for its effect on him. Nonetheless, by explicitly agreeing with the trial court's proposed limiting instruction, MSA invited the evidentiary error. It cannot challenge it on appeal. *E.g.*, *In re Pers. Restraint of Breedlove*, 138 Wn.2d 298, 313, 979 P.2d 417 (1999) (express agreement to erroneous action constitutes invited error).

A limiting instruction is proper when evidence that could be hearsay is offered for something other than its truth. When the case is retried, an instruction can be crafted that

applies evenhandedly to both parties' evidence of statements made during the investigation that are circumstantial evidence bearing on motive.

MSA's challenge that the limiting instruction was a comment on the evidence would ordinarily require further analysis. The Washington State Constitution prohibits a judge from commenting on the evidence. WASH. CONST. art. IV, § 16. Accordingly, a comment on the evidence, if manifest, can be challenged for the first time on appeal. RAP 2.5(a)(3). That is not the case with invited error, however. The invited error doctrine applies even to manifest constitutional errors. *State v. Sykes*, 182 Wn.2d 168, 187, 339 P.3d 972 (2014) (Madsen, C.J., dissenting) (citing *State v. McLoyd*, 87 Wn. App. 66, 70, 939 P.2d 1255 (1997)).

III.    QUALHEIM TESTIMONY

MSA contends the trial court erred by refusing to allow it to call a DOE witness in the defense case to respond to unexpected testimony from DOE witnesses in Atwood's case.

In order to present evidence in the possession of DOE employees at trial, the parties had to navigate federal regulations, often called "*Touhy* regulations," that regulate the conditions and procedures under which a federal agency's employees may testify concerning their work. *See* 5 U.S.C. § 301; *State v. Vance*, 184 Wn. App. 902, 912-13, 339 P.3d 245 (2014) (citing *United States v. Soriano-Jarquin*, 492 F.3d 495, 504 (4th Cir. 2007) (citing, in turn, *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 468, 71 S. Ct.

53

416, 95 L. Ed. 417 (1951))). The DOE's regulations appear at 10 C.F.R. § 202.22 and forbid DOE employees from responding to court or other document or information requests without prior approval of DOE's general counsel.

Atwood's lawyer requested approval to call four current and former DOE employees as witnesses during the trial. Atwood's letter requesting approval stated that if called, each of the four may be asked to testify "based upon his personal knowledge about the scope of work Ms. Atwood performed." CP at 6017-21. The DOE General Counsel's office responded that the four individuals "are authorized to give testimony as to non-privileged factual matters within their personal knowledge" relating to requested subject matter areas, but were not authorized to testify, e.g., to "matters requiring opinion testimony, either of a factual or legal nature." CP at 6627.

Testimony began on September 15, and the first witness called by Atwood was one of the DOE witnesses, John Silko. When questioning touched on *how* Atwood performed her work, MSA requested a sidebar. The trial court construed "scope of work" broadly, allowing Atwood to elicit testimony from the DOE witnesses about, e.g., how Atwood interacted with others, how she did her job, and whether she was late.

The morning following Silko's testimony, MSA's lawyers notified Atwood's lawyers that in light of the breadth of the DOE employees' testimony, MSA would be requesting DOE's approval to call as a witness another DOE employee, Margo Qualheim, who would support some of MSA's contentions about Atwood. Atwood's lawyers

responded that they would object to her "last minute addition," pointing out that

Qualheim had not been identified by MSA as a witness on the trial management report

(other than as a witness identified by Atwood, who MSA "reserve[d] the right" to call).

CP at 6593, 6576. On September 27, DOE granted MSA's request to call Qualheim as a

witness.

Atwood filed a motion in limine to exclude Qualheim's testimony, claiming that

she was untimely disclosed. The court granted the motion. Applying the analysis

required by *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 933 P.2d 1036 (1997), the

trial court concluded that no lesser sanction than excluding Qualheim as a witness would

suffice.

MSA raises colorable arguments that not only was exclusion of Qualheim

excessive under *Burnet*, but Qualheim may have been a true rebuttal witness who was not

required to be disclosed. Testimony in the case did not conclude until October 5,

meaning that 19 days, including 2 weekends, passed between MSA's September 16

notice that it would seek to call Qualheim and the conclusion of testimony. Atwood

knew of Qualheim, having included her on her own witness list.

MSA also makes a colorable argument that excluding Qualheim was not harmless

error. While most of Atwood's MSA coworkers called as witnesses supported MSA's

position, not Atwood's, Atwood argued to the jury that the coworkers were "simply

doing what they feel like they need to do to keep their jobs." RP at 4764. The same argument could not have been made about Qualheim.

Having found other reversible error and because late notice will not be a problem in a retrial, we decline to consider this issue further.

IV.     ERRONEOUS INSTRUCTION ON ECONOMIC DAMAGES ALSO REQUIRES REVERSAL

The final issue we address is the trial court's instruction 17, which directed the jury on how to calculate future wage loss damages. Atwood was 58 years old at the time she retired in lieu of termination and was 62 years old at the time of trial. Her expert, relying on Atwood's professed intention to work at MSA until age 70, testified to economic damages of $2.1 million in present discounted value.

MSA's expert calculated much lower lost future wage amounts—from $70,982 to $240,480, depending on how quickly Atwood found other full-time employment. She testified that all statistics pointed to someone in Atwood's position, still working at age 59, retiring at age 66. MSA also presented evidence that Atwood had changed jobs often; her average job lasted between two and three years and the longest she stayed at any given job was six years. Its evidence also showed it was common for project managers like Atwood to change jobs.

Both parties based their instruction on damages for future wage loss on a Washington pattern instruction. *See* 6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL § 330.82, at 401 (7th ed. 2019) (WPI). With

bracketing for language that changes based on the evidence in the case, the pattern

instruction reads:

> In calculating damages for future wage loss [*front pay*], you should determine the present cash value of salary, pension, and other fringe benefits from today until the time the plaintiff may reasonably be expected to [*retire*] [*fully recover from the continuing effects of the discrimination*], decreased by any projected future earnings [*from another employer*].

*Id.* (emphasis added). The notes for the instruction observe that "[u]se of the term 'retire'

may not be appropriate in all cases." *Id.*[16]

The trial court's instruction 17 was the instruction proposed by Atwood. It told

jurors that future wage loss should be calculated

> from today until the time the plaintiff may reasonably be expected to retire *or* fully recover from the continuing effects of the discrimination.

CP at 11063 (emphasis added). MSA timely objected, arguing that because it had

presented evidence from which the jury could conclude that Atwood would not remain

employed at MSA through retirement, the time frame given should simply be "from

today until the time plaintiff may reasonably be expected to fully recover from the

continuing effects of the discrimination."

---

[16] Washington pattern instructions use bracketing to identify alternative language with the intention that parties will propose and the court will select the alternatives that are proper based on the evidence in the case. *Cf. Blaney v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 160*, 114 Wn. App. 80, 88-89, 55 P.3d 1208 (2002) (observing that WPI 330.82 provides "alternative language in brackets" and retirement as marking the end date for future wage loss might or might not apply in a given case). Consistent with controlling case law, WPI 330.82 does not include [*retire or fully recover from the continuing effects of the discrimination*] as an alternative.

Jury instructions are sufficient if they: (1) allow each party to argue their theories of the case, (2) do not mislead the jury, and (3) when read as a whole, properly inform the trier of fact of the law to be applied. *Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 36, 864 P.2d 921 (1993). If any of these elements are missing, the instruction is erroneous. *Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wn.2d 851, 860, 281 P.3d 289 (2012). An erroneous instruction is reversible error only if it prejudices a party. *Id*. We review errors of law in jury instructions de novo. *Hue v. Farmboy Spray Co.*, 127 Wn.2d 67, 92, 896 P.2d 682 (1995).

Washington law provides that "[f]ront pay should be awarded 'for a reasonably certain period of time that does not exceed the likely duration of the terminated employment.'" *Lords v. N. Auto. Corp.*, 75 Wn. App. 589, 605, 881 P.2d 256 (1994) (quoting *Hayes v. Trulock*, 51 Wn. App. 795, 802, 755 P.2d 830 (1988)). In an age discrimination case, a jury may be told to consider that the illegally-discharged employee would have continued working for the employer until he or she reached the normal age of retirement, unless the employer provides evidence to the contrary. *Id*. "In other cases, the determination of future lost earnings, including the number of years, is generally left to the jury to determine, once an employee produces evidence from which a reasonable future employment period may be projected." *Blaney v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 160*, 114 Wn. App. 80, 89, 55 P.3d 1208 (2002).

In *Blaney v. International Ass'n of Machinists & Aerospace Workers, District No. 160*, 151 Wn.2d 203, 207-08, 87 P.3d 757 (2004), a union member sued for gender discrimination. The court instructed the jury to calculate the plaintiff's future earnings "from today until the time [plaintiff] may reasonably be expected to retire." *Id.* at 210. The Supreme Court held that the instruction was improper since it denied the jury its role in determining the duration of the plaintiff's future employment—a duration that might not extend to retirement. *Id.* at 210-11.

Atwood contends her proposed jury instruction was proper because it spoke of both retirement and the time by which a plaintiff will fully recover, thereby mirroring the instruction given in *Brundridge*, 164 Wn.2d at 454-55. In *Brundridge*, however, the instruction was not objected to at trial or challenged on appeal. *Brundridge* tells us nothing about the propriety of the instruction.

Instruction 17 was misleading because it provided the jury with two optional time frames for awarding damages: a time frame that ended with full recovery or, at the jury's option, a time frame that continued to retirement. In closing argument, Atwood encouraged jurors to choose the retirement option, telling them:

> So on economic damages, this, again, is the jury instruction: From today until the time the plaintiff may reasonably be expected to retire. Remember, retire. This is the jury instruction, you can give her front pay to retirement, or to whenever you think she's going to reasonably recover from the retaliation and discrimination.

RP at 4781. Atwood argued that the "right answer" on economic damages was its expert's $2.1 million retirement-at-70 calculation. RP at 4788.

The instruction prevented MSA from arguing that the jury was required to limit damages if it found that Atwood could reasonably be expected to fully recover from the discrimination in a shorter time frame. Since Atwood's expert gave the jury a $2.1 million figure for future wages through age 70 retirement, it was a simple matter for the jury to select that figure and avoid having to consider MSA's evidence supporting a shorter time frame.

The instructional error was prejudicial. MSA presented evidence that Atwood could be expected to recover earlier—much earlier. Even having been given the option to award damages through retirement, two jurors disagreed with the damages awarded. The instructional error could have substantially increased the economic damages awarded by the jury.

In the retrial, if MSA presents evidence which, if believed by the jury, shows that Atwood may reasonably be expected to fully recover from the continuing effects of discrimination earlier than the date on which she may reasonably be expected to retire, then the court's instruction should exclude retirement as an option for measuring the future wage recovery period. Such an instruction will permit Atwood to recover future wages through retirement if but only if she proves that retirement is the earliest date on which she may reasonably be expected to fully recover.

We reverse the judgment on the jury's verdict and remand for further proceedings consistent with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

I CONCUR:

_____
Korsmo, A.C.J.

No. 35872-1-III
(consolidated with
No. 35911-5-III)

LAWRENCE-BERREY, J. (dissenting) — I agree with most of the majority's conclusions, including the need for a new trial on the question of future damages. I dissent because the trial court's evidentiary errors did not affect the juries' special verdicts on two of Julie Atwood's three causes of action, and those two verdicts should be affirmed.

The majority correctly concludes the trial court abused its discretion in admitting comparator evidence of four individuals, Lowell M., Michael T., Scott B., and Mary R. The majority also correctly concludes the trial court did not abuse its discretion in admitting some comparator evidence testified to by Sandra Fowler, but did abuse its discretion in admitting Fowler's testimony about Stanley Bensussen and about Frank Armijo's purported retaliation against her.

So the question becomes, given that the month-long trial involved 41 witnesses and over 100 exhibits, do the above comparator evidence errors require reversal of the special verdicts on all three of Atwood's causes of action?

By special verdicts, the jury found that Atwood had proved (1) her gender discrimination claim (Mission Support Alliance (MSA) fired her because it treated her differently than men), (2) her gender retaliation claim (MSA fired her for reporting that her supervisor treated her differently than men), and (3) her wrongful discharge in

violation of public policy claim (MSA fired her for reporting that her supervisor claimed compensation for time spent performing his outside mayoral duties). Because the latter two claims required Atwood to prove that MSA retaliated against her for reporting misconduct, she sometimes referred to those latter claims as her retaliation claims.

*Harmless error standard*

Evidentiary error is harmless unless there is a reasonable probability it materially affected the outcome of the trial. *In re Det. of Post*, 170 Wn.2d 302, 314, 241 P.3d 1234 (2010); *State v. Thomas*, 150 Wn.2d 821, 871, 83 P.3d 970 (2004); *State v. Neal*, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001); *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997); *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986). The improper admission of evidence is harmless error if the evidence is of minor significance in reference to the evidence as a whole. *Thomas*, 150 Wn.2d at 871; *Neal*, 144 Wn.2d at 611; *Bourgeois*, 133 Wn.2d at 403.

*Application of harmless error standard*

It is not difficult for an appellate court to determine what evidence is important at trial and what evidence is not. Experienced trial counsel focus on important evidence in their closing arguments. If improperly admitted evidence was emphasized and relied on by trial counsel in closing, the evidentiary error was likely harmful. *See State v. Easter*, 130 Wn.2d 228, 242-43, 922 P.2d 1285 (1996) (officer's opinion testimony regarding defendant's guilt was not harmless where the prosecutor emphasized the evidence during closing). Conversely, if improperly admitted evidence was not emphasized and relied on

by trial counsel in closing, the evidentiary error was likely harmless. *See State v. Johnson*, 42 Wn. App. 425, 432, 712 P.2d 301 (1985) (officer's testimony of defendant's postarrest silence was harmless where no further evidence of the silence was admitted and prosecutor did not return to the evidence at closing).

In Atwood's initial closing argument she did not discuss Fowler or the other comparators. In MSA's responsive closing, it briefly discussed Fowler and the other comparators. In Atwood's rebuttal closing, she again did not discuss Fowler and the other comparators with respect to her retaliation claims. She then told the jury: "The two retaliation claims stand on their own. They have nothing to do with this [discrimination] claim." Report of Proceedings (RP) at 4905.

Atwood did not emphasize or rely on the improper comparator evidence to prove that MSA retaliated against her for reporting gender discrimination or for reporting her supervisor's false claims for compensation.[1] Because the comparator evidence was not material to the outcome of Atwood's two retaliation claims, there is no reasonable probability that it materially affected the outcome of those claims. As such, the evidentiary error was harmless with respect to those special verdicts and they should be affirmed.

---

[1] Retaliatory discharge requires proof the employer retaliated because the employee *reported* unlawful conduct; the employee need not prove the employer actually *committed* the unlawful conduct. *Hollenback v. Shriners Hosp.*, 149 Wn. App. 810, 821, 206 P.3d 337 (2009).

3

It was not until Atwood addressed her gender discrimination claim in her rebuttal closing that she discussed Fowler's testimony and the comparator evidence. She told the jury:

> This is how we prove this case. We have proved it with comparators. This is our only evidence, besides Sandra Fowler and the things that we've talked about—you know, the Barbie e-mail, the statement by [Steve] Young about Karen Flynn—that's showing the *discriminatory intent* so that you can then connect the dots and say that one of the factors in her termination, Julie's termination, was *gender*. . . .
>
> . . . .
>
> . . . None of these men are terminated. That's our case. *That's our discrimination case.* That's all it is. It has nothing to do with conspiracies, it has nothing to do with fake documents or what they did. That's our case. And we think it's enough for you to find *discrimination*.[2]

RP at 4906, 4908 (emphasis added).

Atwood emphasized and relied upon the improper comparator evidence to prove that MSA committed gender discrimination. Because the improper comparator evidence was material to the outcome of that claim, the jury's special verdict for gender discrimination must be reversed.

---

[2] The majority uses this quote to argue that Atwood emphasized and relied on the comparator evidence for all three of her claims. I do not construe her argument in that manner. Although Atwood three times said the comparator evidence was how she proves her *case*, the context shows she was referring to her gender discrimination *claim*.

I acknowledge reasonable minds can differ on how to construe Atwood's argument. But when reasonable minds can differ, our standard of review requires us to affirm. Ultimately, deferring to the jury's verdict is difficult here, given the size of the verdict and Atwood's evidence, which although sufficient, was "not strong." Majority at 39.

In conclusion, two of the three special verdicts should be affirmed because the improper comparator evidence was harmless error with respect to those verdicts. For this reason, I respectfully dissent.

_____
Lawrence-Berrey, J.